

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. E-15-679

| | |
|---|---|
| WENDY HIGGINS<br>APPELLANT | **Opinion Delivered** September 28, 2016 |
| V. | APPEAL FROM THE ARKANSAS<br>BOARD OF REVIEW<br>[NO. 2015-BR-1923] |
| DIRECTOR, DEPARTMENT OF<br>WORKFORCE SERVICES, and<br>ARKANSAS ATTORNEY GENERAL<br>APPELLEES | AFFIRMED |

**CLIFF HOOFMAN, Judge**

Appellant Wendy Higgins appeals from the decision of the Arkansas Board of Review (Board) affirming and adopting the opinion of the Appeal Tribunal (Tribunal), which denied her unemployment benefits on the basis that she was discharged from last work for misconduct in connection with the work due to excessive absenteeism. On appeal, Higgins argues that the Board's decision is not supported by substantial evidence. We affirm.

Higgins was employed by the Office of the Arkansas Attorney General (AG) as a legal secretary from November 2013 until June 8, 2015, when she was discharged for violating the AG's attendance policy. She was denied unemployment benefits by the Department of Workforce Services (Department) and appealed her denial to the Tribunal, which held a telephone hearing on August 19 and 21, 2015.

At the hearing, Katina Hodge, the employer's representative, testified that the agency has an employee handbook wherein the policies on attendance are set forth. Hodge indicated

SLIP OPINION

that Higgins received a copy of this handbook at the time she was hired on November 5, 2013, and that she received an updated copy on January 16, 2015. Hodge further stated that Higgins was reminded of the procedures for requesting leave and the policies regarding absenteeism via an email from Sarah Tacker, the deputy attorney general in Higgins's department, on May 12, 2015.

According to Hodge, Higgins had a history of poor work attendance prior to her discharge. In October 2014, she was verbally warned about her attendance issues by one of her supervisors, Jim DePriest. On February 6, 2015, a memorandum was issued to Higgins by Tacker and another senior assistant attorney general memorializing the problem of Higgins's excessive absences. This memo indicated that Higgins had been classified as "Leave Without Pay (LWOP)" for 188.75 hours since her employment with the AG began, with 10.5 of these hours having been accrued in 2015. The memo further noted that Higgins had taken an additional four hours of leave without pay the previous day that had not yet been documented on her time sheet. Higgins was informed that her attendance had not improved even after her prior verbal warning and that her excessive absences had been disruptive to her colleagues. The memo further notified Higgins that if her conduct was not immediately remedied, then she would be subjected to disciplinary action, up to and including termination.

Following the February 6, 2015 memo, Hodge testified that Higgins was again warned about her excessive absences on March 2, 2015, when Tacker responded to Higgins's email that she would be absent that day by replying, "Please be aware that unexcused absences, even

SLIP OPINION

if there is leave available, is still not in accordance with office policy. Please see p. 6 of the handbook."

Hodge stated that Higgins was on Family Medical Leave Act (FMLA) leave from March 10, 2015, until June 2, 2015, when she was released by her physician to return to work with no restrictions. Although Higgins returned to work on June 2, 2015, Hodge testified that she then notified the AG that she would be absent on June 8 and 9. Because Higgins did not have any paid or unpaid leave remaining and because these absences had not been approved, Hodge stated that Higgins was in direct violation of the AG's attendance policies and was therefore terminated on June 8, 2015.

In her testimony, Higgins agreed that she had received a copy of the employee handbook and that she was aware of the attendance policies therein. She further admitted that she had received warnings about her excessive absenteeism. However, Higgins testified that she was on FMLA leave at the time of the May 12, 2015 email from Tacker, and Higgins claimed that this email set forth a new policy regarding leave without pay and unexcused absences. Higgins stated that she was not aware of this email until June 8, 2015, when she was terminated.

Higgins testified that she began having health issues in September 2014, at a time when she claimed that she was being harassed at work and was under severe stress. She indicated that she was experiencing blackouts, which caused her to fall and suffer concussions. She stated that she was placed on medical leave by her doctor and that she was eventually diagnosed with neurocardiogenic syncope. She was required to exhaust all of her available

SLIP OPINION

leave time before taking her FMLA leave. Higgins stated that she had her first appointment with a neurologist on June 1, 2015, and that she was scheduled for several follow-up procedures on June 9, 2015.

When she returned from FMLA leave on June 2, 2015, Higgins testified that she notified the human-resources manager that she would need to be absent on June 9 and provided documentation from her doctor. She was told that Tacker was out of town that week and to place her leave request in Tacker's box, which she stated that she did. She also emailed a reminder to Tacker and to Edith Collins, the lead secretary, on June 5. Higgins stated that she did not hear from Tacker until the following Monday, June 8, when Higgins emailed Tacker, Collins, and Robin Ball, who was in charge of the attendance calendar, that she was sick and would not be working that day. Higgins again noted in this email that she would also be out the following day, on Tuesday, June 9, for her medical procedures.

Tacker responded via email that Higgins's absence that day and her planned absence the next day were "problematic and a violation of office policy." Tacker indicated that she had planned on addressing the June 9 planned absence with Higgins that morning but that she was unable to do so due to Higgins's absence. The email referred to several handbook provisions regarding attendance, as well as the May 12, 2015 email, and it concluded by stating that "your absence today and your planned absence tomorrow is unapproved. You have no available paid leave and your FMLA leave has been exhausted. Pursuant to our policies, you are subject to additional disciplinary action, up to and including termination." Tacker stated that she was referring the matter to Chief Deputy Julie Benafield. Higgins was

notified by Benafield later that day that she was being terminated "for violating office policy regarding leave without pay."

Higgins testified that she felt she was terminated on the basis of a policy contained in the May 12, 2015 email that she had never received or read. She stated that some of her absences in the past had been excused even though she did not have any available paid leave and that the handbook did not indicate that she could be fired for using leave without pay. Higgins testified that her health issues were beyond her control and that she would never have intentionally tried to get fired from her job.

Following the hearing, the Tribunal affirmed the Department's denial of unemployment benefits under Arkansas Code Annotated section 11-10-514(a)(2) (Repl. 2015), finding that Higgins was discharged for excessive absenteeism. While the Tribunal noted Higgins's claim that she was held to policies contained in an email she had not seen, the Tribunal found that the email merely explained the policy in the handbook and did not alter it. The Tribunal noted that the email's statement that absences were unexcused until they were approved was "simply a truism" and that the email only clarified the policy that the employer does not consider the reason for an absence when the employee has no paid leave available. The Tribunal found that Higgins had been reprimanded, that she was aware that her attendance was a problem, and that she was discharged pursuant to the employer's attendance policy; therefore, she was discharged from last work for misconduct in connection with the work.

The Board affirmed and adopted the Tribunal's decision. The Board agreed with the

Tribunal's finding that Higgins was discharged for violating her employer's attendance policy, despite having received warnings alerting her that her attendance was unacceptable. The Board noted that, even though Higgins might have been absent due to illness, being absent put a hardship on the employer's workforce. Thus, the Board found that Higgins's attendance demonstrated a disregard of the standards of behavior that her employer had a right to expect of its employees and that she was discharged from her last work for misconduct connected with the work. Higgins has timely appealed, arguing that there is not substantial evidence to support the Board's decision.

On appeal in unemployment cases, findings of fact by the Board are conclusive if supported by substantial evidence, and review is limited to determining whether the Board could reasonably reach its decision based upon the evidence before it, even if there is evidence upon which the Board might have reached a different decision. *Hiner v. Dir.*, 61 Ark. App. 139, 965 S.W.2d 785 (1998). The reviewing court may not substitute its findings for the Board's, even though the court might have reached a different conclusion had it made an original determination on the same evidence. *Thomas v. Dir.*, 55 Ark. App. 101, 931 S.W.2d 146 (1996). Also, the credibility of witnesses and the weight to be accorded their testimony are matters to be resolved by the Board. *Johnson v. Dir.*, 84 Ark. App. 349, 141 S.W.3d 1 (2004).

Pursuant to Arkansas Code Annotated section 11–10–514(a)(1), an individual shall be disqualified for benefits if he or she is discharged from his or her last work for misconduct in connection with the work. Section 11–10–514(a)(2) further provides that "[i]n cases of

SLIP OPINION

discharge for absenteeism, the individual shall be disqualified for misconduct in connection with the work if the discharge was pursuant to the terms of a bona fide written attendance policy, regardless of whether the policy is a fault or no-fault policy." Whether an employee's actions constitute misconduct in connection with the work sufficient to deny unemployment benefits is a question of fact for the Board. *Thomas*, *supra*.

On appeal, Higgins argues that the Board erred in its decision that she was disqualified from receiving unemployment benefits pursuant to section 11–10–514(a)(2) because she did not intentionally or with wrongful intent violate the AG's attendance policy. She contends that her absences due to illness were beyond her control and that her conduct did not amount to misconduct. Higgins cites to cases in which we have held that in order for an employee to be engaged in misconduct sufficient to warrant the denial of unemployment benefits, the employee's actions must be a deliberate or willful disregard of the employer's best interest or a disregard of a standard of behavior that the employer has a right to expect of its employees. *See, e.g.*, *Johnson v. Dir.*, 2015 Ark. App. 389, 465 S.W.3d 878 (stating that misconduct requires more than mere inefficiency, unsatisfactory conduct, failure in good performance as a result of inability or incapacity, inadvertencies, ordinary negligence in isolated instances, or good-faith errors in judgment or discretion); *Hernandez v. Dir.*, 2015 Ark. App. 290, 461 S.W.3d 708 (same).

While these principles continue to apply to cases in which an employee is disqualified from receiving unemployment benefits for misconduct in general, Ark. Code Ann. § 11–10–514(a)(2) was amended in 2011 to provide that in the specific situation where an employee

7

SLIP OPINION

has been discharged on the basis of absenteeism, that employee may be disqualified for misconduct if the discharge was pursuant to the terms of a bona fide written attendance policy, regardless of whether the policy is a fault or no-fault policy and regardless of the reason for the employee's absences. *See* Acts of 2011, Act 861 § 4, eff. July 27, 2011. *See also* Acts of 2013, Act 1077 § 1, eff. Aug. 16, 2013 (further removing the requirement that the written attendance policy provide for progressive warnings). Although *Hernandez*, *supra*, was decided after section 11–10–514(a)(2) was amended, it did not involve a situation where the employer had a bona fide written attendance policy that it followed in terminating the employee. As this court noted in *Hernandez*, where the employer has no written policy or fails to follow its written policy, then the facts must be evaluated to determine whether the employee's behavior was a willful disregard of the employer's interest. Also, in *Johnson*, *supra*, we reversed the Board's finding of misconduct where there was no evidence that the employee was aware that she was released to return to work by her treating doctor and where even the Board indicated that there may have been a misunderstanding on the employee's part.

Higgins also cites to *Walls v. Director*, 74 Ark. App. 424, 49 S.W.3d 670 (2001), and to *Oliver v. Director*, 80 Ark. App. 275, 94 S.W.3d 362 (2002), in support of her argument that she did not intentionally violate the AG's policy on absenteeism. However, both of these cases were decided prior to the 2011 amendment of section 11–10–514(a)(2), and thus, the reasons for the employees' absences were relevant in deciding whether there was misconduct in those cases. Her reliance on *Rodriquez v. Director*, 2013 Ark. App. 361, is also misplaced, as that case did not involve a discharge for absenteeism.

8

Here, the provisions in the AG's employee handbook specifically provide that excessive absenteeism or any absences without notice are unacceptable; that the employee must consult with the Attorney General or the Chief Deputy for approval of leave without pay; and that absences without approval may subject the employee to disciplinary action, including termination. Furthermore, Higgins was verbally warned about her absences in October 2014, and she received a written warning memorializing her excessive number of hours of leave without pay in February 2015. She was cautioned at that time that continued absences could result in disciplinary action, including termination for cause. On March 2, 2015, prior to her FMLA leave, Higgins was again warned that unexcused absences were in violation of the employer's policy. After Higgins had exhausted her FMLA leave and had returned to work on June 2, 2015, she then notified her employer that she would be absent on June 9. Higgins had not yet received approval for her planned absence on June 9 when she notified the AG that she was sick on the morning of June 8 and would be missing that day as well. At that time, Higgins's supervisor informed her that she had no available leave, that her absences were unapproved, and that she was therefore in violation of the office's attendance policies. She was terminated later that day due to her violation.

Based on this evidence, the Board found that, regardless of Higgins's argument that her absences were due to illness and were not intentional, she was discharged for violating her employer's attendance policy. Because we conclude that there was substantial evidence to support the Board's decision that Higgins was discharged for misconduct connected with the work pursuant to Ark. Code Ann. § 11-10-514(a)(2), we affirm.

9



Affirmed.

HARRISON and WHITEAKER, JJ., agree.

*Davidson Law Firm*, by: *Angela Echols*, for appellant.

*Phyllis Edwards*, for appellee.